104

(No. 86-CC-2516— <span style="background:black;color:black"></span>)

LILLIAN MINOR, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed August 28, 1996.*

*Opinion on Rehearing February 18, 1998.*

HILFMAN & FOGEL (STEVEN FUOCO), Counsel for Claimant.

JAMES E. RYAN, Attorney General (CYNTHIA J. WOOD, Assistant Attorney General, of counsel), for Respondent.

OPINION

RAUCCI, J.

On February 29, 1984, before 8:00 a.m., Claimant Lillian Minor slipped and fell when trying to enter the Forbes Building on the grounds of the Manteno Mental

Health Center operated by the Illinois Department of Mental Health.

She was employed by the Regional Office of Education for the Kankakee School District as a social worker. She was assigned to work in the Forbes Building, and had been so assigned for almost two years.

She had arrived early on February 29, 1984. While it was not then snowing, she noticed that the back entrance that she normally used was blocked by a pile of snow. The pile, almost two feet high and knee deep to her, covered almost the entire width of the sidewalk in front of the back entrance. It was evident to her that the pile was not wind-blown snow because it was clumpy and similar to clumps that form after snow and ice have been shoveled. Since it was not possible to walk around or jump over the pile, and she did not want to walk through the pile, she got back into her car and drove to the front entrance. The area adjacent to the front entrance had not been shoveled at all, was covered with ice and snow, and appeared worse than the area at the back entrance. She returned to the back entrance. Upon closer examination, she noticed some footprints in the pile so she decided to step into the existing footprints in order to enter the building. She stepped gingerly and watched where she stepped in order not to fall. However, she fell on her third step because there was a clump of ice buried in the pile. She fell on her outstretched hands and knees.

After she fell, she felt as though her hands and fingers were frostbitten. She got up and managed to get into the building. She reported her fall to her supervisor and other coworkers. She later observed swelling in her right hand and she could barely move her fingers. She then sought medical treatment, first at the medical facility at Manteno, where she was refused because she was not a State employee, then at the emergency room at St. Mary's Hospital in Kankakee.

There she received an X-ray, pain pills and a referral to an orthopedist, Dr. Choy. Dr. Choy gave her a short arm splint to wear. She missed one week of work immediately following her fall.

She remained under Dr. Choy's care for several months. Due to a lack of improvement, in April, 1984, she started seeing Dr. Keegan, a neurosurgeon. He determined that her ability to grasp with her right hand had diminished and that muscle atrophy had occurred. An electromyogram and nerve conduction velocity studies supported a diagnosis of ulnar nerve compression of the right elbow. The ulnar nerve provides muscle and sensory function to the hand and fingers. Accordingly, on May 11, 1984, Dr. Keegan operated on her to decompress the ulnar nerve. As a result of the surgery, she was not able to work for approximately 27 days and has a three-inch scar on her right elbow. After the surgery, she healed normally and was released to return to work with no restrictions.

Approximately three years after the fall, she fell down the stairs at her home and hit her right elbow. She suffered the same symptoms as she had after the prior fall. Dr. Keegan testified that he saw her again on March 31, 1985, and determined that she suffers from carpal tunnel syndrome on both sides, more notably on the right side. He directed her to wear a splint at night to alleviate the problem. If this conservative treatment is successful, no further treatment would be necessary. If not successful, surgery may be required.

Dr. Keegan testified that the ulnar nerve depression was "directly related" to the first fall. There is a "good possibility" that the carpal tunnel syndrome was also related to that fall, but he could not be positive.

At the time of the hearing in 1995, Claimant testified that she has a lack of strength in her right hand, that her

fingers get stiff and cramp, and that she suffers pain in her arm at times. She cannot write as much or as long as she did before the accident. She has difficulty with her grip and if she grips too hard, she gets cramps. She cannot drive as she used to and has others drive her. She does not cook because she has dropped things and is fearful of dropping something hot and scalding herself. She cannot bowl or play baseball. Prior to February 29, 1984, she had no problems with her right arm, elbow or hand.

Steve Odom, a former State employee, testified on behalf of Claimant. He had worked at Manteno from 1975 until July, 1984. He observed individuals from the Department of Transportation clearing ice and snow with tractors and big equipment on the big sidewalks, and shovels and hand tools on the entrances and small sidewalks. He did not observe any piles of snow in front of doorways, and had no recollection about the condition of the sidewalks or doorways around the Forbes Building on February 29, 1984.

Alicia Parkinson testified that she worked at the Regional Office of Education of Kankakee County from 1982 to 1985. On February 29, 1984, Claimant told her that she had fallen on a snow pile and was complaining that her arm was hurting. Claimant looked like she was in pain. The witness went outside and looked at the snow pile. It was in front of the doorway that was normally used by employees and covered the area from the building to the edge of the sidewalk. It was about two feet deep and looked like a "heaped pile of snow" and was "lumpy" and "irregular." It was not a drift but was shoveled snow.

Alicia Parkinson had used the same entrance as Claimant on February 29, 1984. She did not fall and has no knowledge of anyone else falling on that day.

In order for Claimant to prevail, she must establish the existence of a duty, a breach of that duty and an injury that was proximately caused by the breach. (*Johnson v. National Super Markets, Inc.* (1994), 257 Ill. App. 3d 1011, 1015, 630 N.E.2d 934, 938.) A property owner has no duty to remove natural accumulations of snow and ice, but if he chooses to do so, he must exercise ordinary care.

Here, the Respondent undertook to remove the snow and ice. The result of the removal left a snow and ice pile that was heaped, lumpy and irregular.

However, Claimant has failed to prove by a preponderance of the evidence that her injury was proximately caused by the pile. She observed the pile, determined that it was not safe to attempt to walk on it, went to the front, and then returned and, notwithstanding her misgivings, she attempted to walk over the pile. Her actions, whether viewed as proximately causing the injury, or as substantially contributing to her injury, resulted in the fall.

In *Johnson, supra,* the plaintiff did not see the patch of ice which caused her fall and it was not obvious. She observed only a puddle. In the instant case, Claimant was not only aware of the unnatural accumulation of snow but also that the pile contained clumps of ice. She was aware of the risk and initially declined to take a risk which she viewed as dangerous. Invitees assume normal, obvious or ordinary risks attendant to the use of the premises. (*Ji Wong v. State* (1983), 45 Ill. Ct. Cl. 180.) The Claimant, by deciding to enter the building by an entrance that she knew was blocked by an unnatural accumulation of shoveled snow and ice, assumed a normal, obvious and ordinary risk.

The Respondent's actions were not the proximate cause of Claimant's injuries. Additionally, Claimant was

guilty of comparative negligence. We have adopted the doctrine of comparative negligence and find it applicable here, notwithstanding the Respondent's failure to plead it as an affirmative defense. Claimant's actions were more responsible for her injuries than the Respondent's actions.

As we stated in *Odom v. State* (1988), 41 Ill. Ct. Cl. 103:

"No claimant has the right to expose himself or herself to possible danger and then recover damages for injuries which could have been avoided by the use of reasonable care, and claims for personal injuries must be analyzed under the doctrine of comparative negligence to determine whether any of the parties exercised less than reasonable care which proximately led to the claimant's injuries."

It is therefore ordered, adjudged and decreed that this claim be, and it is hereby, dismissed with prejudice and forever barred.

## OPINION ON REHEARING

FREDERICK, J.

This cause comes before the Court on Claimant's petition for rehearing. On August 28, 1996, an opinion was filed denying the Claimant's claim. The judge who authored the opinion had previously recused himself from this case back in January, 1988. At the time, the judge had a potential conflict. That judge subsequently left the Court and then later rejoined the Court. At the time the judge authored the August 28, 1996, Opinion, he no longer had an actual or potential conflict in regard to this case. However, in the interests of fairness, the Court has granted Claimant's petition to reconsider the case and we do so reconsider the case and enter this opinion.

The facts are not in dispute. On February 29, 1984, before 8:00 a.m., Claimant slipped and fell when trying to enter the Forbes Building on the grounds of the Manteno Mental Health Center operated by the Illinois Department of Mental Health. Although Claimant was employed

by the Regional Office of Education for the Kankakee School District as a social worker, through an agreement with her employer and the Illinois Department of Mental Health, her assigned work location was in the Forbes Building. Claimant had been assigned to that work location for almost two years as of February 29, 1984. Claimant testified that February 29, 1984, was a very cold, wintery day with precipitation. On February 28, 1984, it had snowed "really bad" and it was the worst snow and coldest day of 1984. This snow had apparently occurred after she left work on February 28, 1984.

According to Claimant, she arrived at work early on February 29, 1984. Claimant testified that she always liked to get to work early so she could get a parking place close to the door. She was the first to arrive to work that day. After parking, Claimant observed that the sidewalk had not been cleared and that the back entrance that she had used to enter the building for approximately two years was blocked by a pile of snow. The pile, which was almost two feet tall and knee deep to the Claimant, covered almost the entire width of the sidewalk in front of the back entrance to the building. It was evident to Claimant that the pile was not wind-drifted snow in that it looked dirty and clumpy and was similar to clumps that form after snow and ice have been shoveled. Since it was impossible for Claimant to walk around or jump over the pile and because she did not want to walk through the pile, she got back into her car and drove to the front entrance. The front entrance appeared to be in worse condition to Claimant because it had not been shoveled at all and was covered with ice and snow. Claimant could see the ice and the walk appeared slippery. Thereafter, Claimant returned to the back entrance. Upon closer inspection, Claimant noticed some footsteps in the pile at

the back entrance so she decided to step into the existing footprints in order to enter the building. According to Claimant's testimony, she used care by stepping gingerly and watching where she stepped in order not to fall. Notwithstanding that care, Claimant fell on her third step. Claimant testified that she fell because there was a clump of ice buried in the pile. Claimant fell on her outstretched hands and knees.

After Claimant fell, she felt as though her hands and fingers were frostbitten. Nevertheless, she continued on and made it into the building. No one was present in the Claimant's office when she went in. Later, Claimant reported her fall to her supervisor and other co-workers when they arrived. Eventually Claimant observed swelling in her right hand and she could barely move her fingers. Claimant then sought medical treatment. She first sought treatment at the medical facility in the Center but she was refused treatment because she was not a State employee or resident of Manteno. She then sought treatment at the emergency room of St. Mary Hospital in Kankakee.

At the emergency room, Claimant received an x-ray, pain pills, and a referral to an orthopedist, Dr. Choy. Dr. Choy gave Claimant a short arm splint to wear. Claimant also missed one week of work immediately following her fall.

Claimant remained under Dr. Choy's care for several months. However, due to a lack of improvement, in April, 1984, she started seeing Dr. Harold Keegan. Dr. Keegan, a neurosurgeon, determined that Claimant's ability to grasp with her right hand had diminished and that muscle atrophy had occurred. An electromyogram (EMG) and nerve conduction velocity studies supported a diagnosis of ulnar nerve compression of the right elbow. Accordingly, on May 11, 1984, Dr. Keegan operated on Claimant

to decompress the ulnar nerve. As a result of the surgery, Claimant was off work for approximately 27 days and has a three-inch scar on her right elbow. After the surgery, Claimant was deemed to be healing normally and was released to return to work with no restrictions.

Claimant's weekly salary in February, 1984, was approximately $475. Claimant's total lost wages totaled $3,040. Additionally, Claimant's total medical expenses totaled $3,036.75.

Approximately three years after the fall on February 29, 1984, Claimant fell down the stairs at her home and hit her right elbow. As a result of the fall, she suffered the same symptoms as she had suffered on February 29, 1984. According to Dr. Keegan, who saw Claimant on March 31, 1985, Claimant has carpal tunnel syndrome on both sides, more notably on the right side. Dr. Keegan ordered Claimant to wear a splint at night to help alleviate the problem. If that conservative treatment would be successful, no further treatment would be necessary. However, if it is not successful, surgery may be required.

According to Dr. Keegan, the ulnar nerve depression was "directly related" to the fall sustained by Claimant on February 29, 1984. He also indicated that there was a "good possibility" that the carpal tunnel syndrome was also initiated by the fall. However, he could not be positive in that regard. There was no evidence of any degenerative changes in Claimant's right hand in 1984.

As of the date of the hearing, Claimant testified that she had a lack of strength in her right hand, that her fingers get stiff and cramp, and that she had pain in her arm at times. Claimant testified that she cannot write as much or as long as she did before the accident. She has trouble with her grip and if she grips too hard, she gets cramps.

She cannot drive like she used to and has to get someone else to drive her around. She also does not cook because she has dropped things and is afraid that she will drop something hot and scald herself. Also, Claimant testified she cannot bowl or play baseball. Prior to February 29, 1984, Claimant did not have any problems with her right arm, elbow or hand.

Steve Odom, a former State employee, testified on behalf of Claimant. From March, 1975, until July, 1984, Mr. Odom was a laborer in the plumbing department at Manteno. During that time period, he observed individuals from the Transportation Department's ground crew clearing ice and snow around the Forbes building. In cleaning the sidewalks, they would use tractors and big equipment on the big sidewalks and shovels and hand tools on the entrances and small sidewalks. At no time did Mr. Odom observe any piles of ice and snow in front of doorways. Mr. Odom had no recollection about the condition of the sidewalks or doorways around the Forbes Building on February 29, 1984.

Alicia Parkinson testified that she worked at the Regional Office of Education of Kankakee County from 1982 to 1985. On February 29, 1984, Claimant told her that she had fallen on a snow pile and was complaining that her arm was hurting. Ms. Parkinson indicated that Claimant looked like she was in pain. Ms. Parkinson went outside and looked at the snow pile. According to Ms. Parkinson, the snow pile was in front of the doorway that was normally used by employees and covered the area from the building to the edge of the sidewalk. It was about two feet deep and looked like a "heaped pile of snow" and was "lumpy" and "irregular." It was not a snow drift but was shoveled snow. Ms. Parkinson used the same entrance Claimant did to enter the Forbes Building on February 29,

1984. However, she did not fall and had no knowledge that anyone else fell. Claimant observed some plowing the morning of February 29, 1984, at Manteno but not at the two entrances she tried to use. Both Claimant and Ms. Parkinson testified that the snow pile was approximately two feet tall and "heaped," "lumpy," "irregular," and looked like snow that had been shoveled.

The State presented no evidence and raised no affirmative defenses.

To prevail, the Claimant must prove by a preponderance of the evidence that the Respondent had a duty toward Claimant, that Respondent negligently breached that duty, that the negligence of Respondent was a proximate cause of Claimant's injury and Claimant's damages. Claimant must also prove that Respondent had actual or constructive knowledge of the dangerous condition. (*Hardeman v. State* (1995), 47 Ill. Ct. Cl. 292; *Lee v. Board of Governors of State Colleges and Universities* (1995), 48 Ill. Ct. Cl. 201.) Our analyses begin and end with the first element of the required proof. The State has a duty to exercise reasonable care for the safety of invitees using State buildings and property, but the State is not an insurer of the safety of invitees. (*McGraw v. State* (1986), 39 Ill. Ct. Cl. 182; *White v. State* (1986), 38 Ill. Ct. Cl. 1.) In a long line of cases, this Court has adopted the doctrine that an invitee assumes all normal, obvious or ordinary risks attendant to the use of the premises. *Sanders v. Board of Governors of State Colleges and Universities* (1995), 48 Ill. Ct. Cl. 177.

The open and obvious doctrine is based on public policy, developed long ago to promote the unfettered use of land. The application of the doctrine contradicts the traditional duty analyses of a negligence case. The doctrine focuses on whether the risk involved is open and obvious.

If the risk is open and obvious, then the duty of care does not exist. The basis of the doctrine is that the owner's duty to invitees arises only to the extent of the owner's superior knowledge of the dangerous condition. The general rule is that a landowner has no duty to warn of open and obvious conditions.

Using traditional duty analyses, the Court considers the likelihood of injury, the potential gravity of the injury, the reasonable foreseeability of the injury, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the Respondent. *Lance v. Senior* (1967), 36 Ill. 2d 516.

The law has always provided that landowners should not be confronted with the impossible burden of rendering their premises injury-proof and that landowners are entitled to expect invitees to exercise care for their own safety. Therefore, a Claimant must establish the Respondent's duty to guard against the injury. The duty analysis focuses on the landowner and not on the Claimant's actions. The key is whether the landowner could reasonably foresee injury to the Claimant. The landowner is not required to anticipate the negligence of the Claimant.

Following the open and obvious doctrine, we find under the facts of this case that Respondent had no duty to warn Claimant, an invitee, of this open and obvious snow pile. According to Claimant, the worst snowfall of the year had occurred. Respondent was still plowing in the area and had not completed snow removal. Claimant arrived very early to work and was the first to arrive in her section. Claimant observed the snow piled in front of the back door. She observed snow and ice and slipper conditions by the front door. Respondent did not have superior knowledge to Claimant regarding this snow pile.

The same considerations under the traditional duty analyses indicate that the Respondent had no duty to Claimant. The magnitude of the snowfall, the fact that Claimant was early for work, and that Respondent was still plowing snow prior to the shoveling of door areas as had been done in the past lead the Court to find that Claimant's injury was not foreseeable and that, therefore, Respondent had no duty of care towards this Claimant under these facts in regard to the snow pile. Walking through a two-foot snow pile is an open and obvious danger. The Respondent had no duty to warn Claimant of this open and obvious danger. Where there is no duty, there is no liability. This is not a defense but a failure of Claimant to prove a duty by a preponderance of the evidence. As Claimant has failed to prove a duty, the Court need not discuss breach of duty, proximate cause and damages.

For the foregoing reasons, it is the order of the Court that Claimant's claim be and hereby is denied.